(C. D. 1362)

WILLIAM DIXON, INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided August 24, 1951)

*Barnes, Richardson & Colburn* (*Edward N. Glad* of counsel) for the plaintiff.
*David N. Edelstein,* Assistant Attorney General (*Jerome Vale,* special attorney), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges

MOLLISON, Judge: The merchandise the subject of this protest was referred to during the trial as "ruby powder" and is described on the invoice as "35 kgs de poudre à polir (poudre de rubis)." It was classified by the collector of customs as a pulverized artificial abrasive containing more than three-tenths of 1 per centum of chromium under the provisions therefor in paragraph 1514 of the Tariff Act of 1930 and assessed with duty at the rate of 60 per centum ad valorem accordingly. It is claimed to be properly dutiable at the rate of 12½ per centum ad valorem under the provision in paragraph 13 of the same act, as modified by the British Trade Agreement, T. D. 49753, for "powders * * * for * * * polishing." The complete text of both provisions are set forth in the margin.[1]

The position of the plaintiff is that there is a distinction between abrasives and polishing powders; that the former are used for cutting and grinding operations where the purpose is to cut down the surface, while the latter are used for operations in which it is only desired to achieve a high luster. It is the defendant's contention that abrasives have polishing as well as cutting functions, and that since the merchandise at bar meets all of the requirements of abrasives as to composition and use, it is an abrasive. The plaintiff did not attempt to controvert the findings implicit in the collector's classification that the merchandise is artificial, that it is "ground, pulverized, refined, or manufactured," and that it contains more than three-tenths of 1 per centum of chromium. It was conceded that the merchandise does not contain alcohol.

On the trial of the issue, the plaintiff called three witnesses, the defendant one. The first witness, a master mechanic employed by the plaintiff, the business of which is the importation and manufacture of tools and supplies, including abrasives and polishing powders, testified that his work involved the use of abrasives and polishing powders, and stated that the function of an abrasive is to cut away or grind away a surface. He stated that although he had not worked with the imported material (represented by the official sample received in evidence as plaintiff's exhibit 1), he had tried it occasionally on surfaces for his own information and found that "there was no apparent cutting away

---

[1] PAR. 13 [as modified by T. D. 49753]. Blackings, powders, liquids, and creams for cleaning or polishing, not specially provided for, and not containing alcohol, 12½% ad val.

PAR. 1514. Emery, corundum, garnet, and artificial abrasives, in grains, or ground, pulverized, refined, or manufactured, 1 cent per pound; emery wheels, emery files, and manufactures of which emery, corundum, garnet or artificial abrasive is the component material of chief value, not specially provided for; and all papers, cloths, and combinations of paper and cloth, wholly or partly coated with artificial or natural abrasives, or with a combination of natural and artificial abrasives; all the foregoing, 20 per centum ad valorem. Any of the foregoing, if containing more than one-tenth of 1 per centum of vanadium, or more than two-tenths of 1 per centum of tungsten, molybdenum, boron, tantalum, columbium or niobium, or uranium, or more than three-tenths of 1 per centum of chromium, 60 per centum ad valorem.

from the surface" but that it gave the surface "a lustre or high polish." He produced a small can of a product known as "Norbide Abrasive" (later received in evidence as plaintiff's illustrative exhibit 2) which he identified as an abrasive, and two pieces of plate glass. The surface of the piece received in evidence as plaintiff's illustrative exhibit 3 he stated had been ground with Norbide, and it exhibits a scratched, almost opaque effect. The surface of the piece received in evidence as plaintiff's illustrative exhibit 4 he stated had been subjected to the same treatment with the imported product, exhibit 1, and it exhibits to the eye a clean, unscratched surface. He repeated the experiment in the courtroom upon different ends of another piece of glass, received in evidence as plaintiff's illustrative exhibit 5, with substantially the same results.

To our minds, the experiments represented by illustrative exhibits 3, 4, and 5 are inconclusive and of no probative force. It was admitted by the witness that the materials of which the imported product and the Norbide Abrasive are made are different, and it would be expected that different materials would give different results. There is nothing to show the fineness, in the scale of abrasives, of the Norbide Abrasive used in the experiments, or to show whether the finest abrasive, or even a finer abrasive, would give the same or similar results.

On cross-examination, the witness stated that among the more common artificial abrasives with which he was familiar were "various aluminum oxides," and it is noteworthy that it was established by the defendant through the testimony of a Government chemist who made an analysis of plaintiff's exhibit 1 that it contained 95.8 per centum of aluminum oxide.

Plaintiff's second witness, a salesman in its employ for 50 years, testified that he had sold both abrasives and polishing powders during that time; that a distinction exists between abrasives and polishing powders in that "An abrasive is used more or less to cut down a rough surface—when there are a lot of marks on it or scratches" while a polishing powder "is used after it has all been finished—after it has been gone over with the abrasive the powder is used to put a lustre on it and a bright finish." Ruby powder, such as exhibit 1, he said, was sold mostly to jewelers "as a polishing powder to put a high lustre on work when it is just about finished."

On cross-examination, this witness admitted that artificial abrasives are also used to polish "if you don't want to polish too fine down," but stated that he was not familiar with artificial abrasives in powdered form used for polishing purposes.

Plaintiff's third witness, a jewelry polisher and finisher, stated that in his work he used abrasives "to clean rings and to cut down fine

marks and bring it to a smooth surface"; that he used a polish "to put a fine finish on a ring when it is complete"; that he had used merchandise similar to plaintiff's exhibit 1, powder of ruby, for a little over 2 years, "in the process of finishing up a ring; putting a high-lustre finish on a ring." It was not used, he said, as an abrasive because it has no cutting power, but was used as a polishing agent.

Two facts stand out as established by the record: (1) That the imported product, represented by exhibit 1, has little or no cutting or abrading power, and (2) that it is used, as polishing powders are used, to impart a high luster or polish to a surface.

The plaintiff's theory of the case seems to be that the terms "abrasive" and "polishing powder" are mutually exclusive, but the line of demarcation between the two does not appear to be as well drawn as plaintiff contends, i. e., that abrasives are limited only to those which cut, grind, rub, or wear away surfaces, while polishing powders do not.

That abrasives in some cases have a polishing function seems to be clear not only from the record but from an examination of the pertinent dictionary definitions in relation thereto. Thus, Webster's New International Dictionary, 2d edition, 1945, defines "abrasive" as—

* * * Any substance used for abrading, as for grinding, polishing, etc. * * *

and "abrade" is defined as—

To rub or wear off; to scrape, grind, or wear away by friction; as, to *abrade* rocks * * *.

Polishing also seems to involve friction, for the same authority defines the verb "polish" as—

To make smooth and glossy by a mechanical process, usually by friction; to burnish; to give luster to; as, to *polish* glass, metals, etc. * * *

It is not revealed in the record just how the ruby powder here involved secures its polishing action, but it seems most probable that it is achieved by friction or rubbing and, consequently, even though there is little or no abrading, cutting, grinding, or wearing away, in the ultimate, the polishing action of the powder at bar is achieved in the same manner as it is achieved in the case of abrasives. It seems to us, therefore, in the absence of proof of a commercial meaning for the tariff terms "abrasives" and "powders * * * for * * * polishing" different from their common meaning, that they are not mutually exclusive, but that the latter, at least insofar as the ruby powder at bar is concerned, is a subdivision of the former.

This being so, the question at issue is the relative specificity of the terms, that is to say, since the ruby powder at bar is both an

artificial abrasive and a powder for polishing, which of the terms more narrowly describes the merchandise involved? That the latter designation, which designates the particular function or use of the merchandise, more specifically describes the product before us than the former, which while also connoting use does so as a class, we think is at once apparent.

Judgment will therefore issue sustaining the protest claim and directing the collector to reliquidate the entry accordingly.